NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0295n.06
Filed: May 1, 2006

04-5718

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LEO ADAMS, M.A., | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| TENNESSEE DEPARTMENT OF FINANCE | ) | O P I N I O N |
| AND ADMINISTRATION, | ) | |
| | ) | |
| *Defendant-Appellee*. | ) | |

BEFORE:     **KENNEDY, COLE and McKEAGUE**

**McKEAGUE, Circuit Judge.** Plaintiff-appellant Leo Adams ("Adams") appeals the district court's

grant of defendant-appellee Tennessee Department of Finance and Administration's ("TDFA")

motion for summary judgment. Adams filed a complaint alleging disparate treatment in violation

of Title VII after he was reprimanded and terminated from his job in the TDFA's Division of Mental

Retardation Services. Adams, an African-American, claims that he was subject to disparate

treatment as a result of a dispute that arose while he was collecting money for the purchase of

appliances for the Division's break room. Adams alleges that he was the victim of months of

discriminatory and retaliatory treatment after the incident.

Following the recommendation of the Magistrate Judge, the district court granted TDFA's

motion for summary judgment, and denied Adams' cross-motion. On appeal, Adams asserts that

he has made out a *prima facie* case of race discrimination and hostile work environment under Title VII. He also alleges a violation of his due process rights. For the following reasons, we affirm the ruling of the district court.

## I. BACKGROUND

### A. Factual Background

The facts in this case are not in dispute. Adams was employed as a Residential Program Specialist in the TDFA Division of Mental Retardation Services ("Division"). There were seven staff members in the Division supervised by the director, Becky St. Clair. ("St. Clair"). Including Adams, four were African-American, one was a Mexican-American, and two were Caucasian.

During a January 2002 staff meeting, it was agreed that Adams would collect money from each of the staff members to purchase appliances for the Division's break room. A dispute arose during the course of the collection. Adams claimed that one of the staff members, Donna Bridges, had not made her contribution to the fund. Bridges, a Caucasian, claimed that she had paid her share and that Adams kept the money. As a result of this dispute, Adams claims that he was subjected to months of discriminatory treatment including verbal reprimands, defamatory comments, and retaliatory treatment.

In response to his alleged mistreatment, Adams sent voluminous e-mail messages to St. Clair and other state officials. The e-mails attempted to document the alleged mistreatment. On June 26, 2002, Adams was issued a written warning by Janet Simons, the Middle Tennessee Regional Director. The warning stated, in relevant part:

Over the past six months, on a recurring and intermittent basis, your work place behavior has degenerated to the point that you have destroyed the supervisor/subordinate relationship . . . . You have repeatedly criticized and aggressively critiqued [St. Clair's] choice of words, phrases, decisions, and suggestions relating to virtually any and every aspect of her attempted communication with you. You have made it clear that you are documenting every possible event so as to present your supervisor in a bad light. The intensity, tone, nature and frequency of your accusations and attacks have risen to the level that your actions constitute impertinence and conduct unbecoming an employee in state service. You have not only failed to maintain satisfactory and harmonious working relationships in the workplace; you have actively worked to destroy such relationships, or prevent their repair following occasional, normal workplace disagreements faced by all employees.

* * *

Because your conduct has become so disruptive to your work unit, and has presented your supervisor extreme obstacles to directing and evaluating your work performance, I have determined that a letter of written warning is appropriate and necessary . . . . I am putting you on notice that failure to radically improve your workplace conduct will subject you to more intense corrective actions, up to dismissal if or when it appears corrective actions do not have the desired effect.

* * *

June 26, 2002, Letter of Janet Simons, JA 258-60.

On June 27, 2002, Adams filed his first complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that the TDFA's discriminatory treatment of him violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*. The EEOC charge listed January 28, 2002, as the earliest date of discrimination and June 27, 2002, as the latest date of discrimination. On June 28, 2002, the EEOC issued its dismissal of this charge and notified Adams of his right to appeal the decision to the federal district court within 90 days. On June 28, 2002, Adams submitted an employee grievance form to dispute Simons' written warning. In a letter dated July 5, 2002,

Adams was advised that his written warning was not "grievable," but would be informally reviewed under the Rules of the Tennessee Department of Personnel. On July 30, 2002, Adams was advised that the warning was upheld after informal review.

On August 1, 2002, Adams sent an e-mail to Deputy Commissioner Richard Kellogg ("Kellogg") asking that the warning be removed from his file. On August 15, 2002, Adams was advised that the written warning had been reviewed again, that no evidence was found to substantiate a claim of unfair or discriminatory employment practices, and that all of Adams' rights to appeal the written warning had been exhausted. Nonetheless, Adams sent approximately nine e-mails to various state officials, including the Governor of Tennessee, the Commissioner of Finance and Administration, the Commissioner of Personnel, and the Director of the Middle Tennessee Regional Office, seeking removal of the written warning.

On October 21, 2002, Adams was issued a letter recommending his termination from employment, and was contemporaneously escorted off of state property by security guards. The letter outlined the grounds for termination; it identified Adams failure to comply with supervisor directives, his obstinate and obstructive workplace behavior, and his apparent unwillingness to work with his supervisor. The letter advised Adams of his right to meet with Deputy Commissioner Duane Hawkins, and to provide information for Hawkins' consideration concerning Adams' employment termination. Adams met with Hawkins on October 25, 2002, to review the recommendation for termination.

On November 12, 2002, Adams filed a second charge with the EEOC alleging race, color, and sex discrimination, as well as retaliation in violation of Title VII. This charge listed October

21, 2002, as the latest date of discrimination, and refers to events alleged to occur as early as January 28, 2002. This second charge states, for the first time, that Adams was the object of a racial slur some two years prior to this EEOC complaint being filed. This second EEOC charge was dismissed on November 14, 2002. Adams was officially dismissed from state service in a letter dated November 18, 2002.

### B. Procedural Background

Adams filed suit in the United States District Court for the Middle District of Tennessee on February 10, 2003. Adams alleges that he was the victim of race discrimination and a hostile work environment in violation of Title VII. He further alleges that the TDFA violated his due process rights under the Tennessee Department of Personnel regulations when they escorted him off of state property before he was afforded the opportunity to present information to the Deputy Commisioner.

The TDFA filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, claiming that Adams cannot establish a *prima facie* case of race discrimination, and that Adams' claims arising from his first EEOC complaint are time-barred. Adams filed a cross-motion for summary judgment.

The Magistrate Judge recommended that the TDFA's motion for summary judgment be granted, and Adams' motion be dismissed. In the report and recommendation, the Magistrate found that 1) Adams was precluded from litigating claims alleged in the first EEOC complaint because he failed to file them within the 90-day period provided by statute, 2) Adams failed to present any triable claim of racial discrimination or hostile work environment, and 3) Adams was afforded all the process he was due in the course of his termination. In a May 20, 2004, order the district court

adopted the Magistrate Judge's recommendation, and granted TDFA's motion for summary judgment, and denied Adams cross-motion. This timely appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This court has jurisdiction pursuant to 28 U.S.C. § 1291 because the district court entered a final order on May 20, 2004.

This court reviews de novo a district court's order granting summary judgment. *Johnson v. Karnes,* 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c), *accord Johnson,* 398 F.3d at 873. The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). *See also Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). Only material facts, those "that might affect the outcome of the suit under the governing law," will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. The court must evaluate each party's motion on its own merits and "draw all reasonable inferences against the party whose motion is under consideration." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). When reviewing a summary judgment decision, an appellate

court must confine its review to the evidence as submitted to the district court. *McClung v. Wal-Mart Stores, Inc.*, 270 F.3d 1007, 1011 (6th Cir. 2001).

### III. ANALYSIS

#### A.  Issues on Appeal

The parties advance five issues on appeal.  First, Adams claims that the district court erred in finding that all of his claims of discrimination arising from his June 2002 EEOC charge are time-barred.  Second, Adams claims that he has made out a *prima facie* case of unfair employment practices in violation of Title VII  based on disparate treatment.  Third, the TDFA argues that, even if Adams established a *prima facie* case of race discrimination, the TDFA has provided legitimate, nondiscriminatory reasons for its decision to reprimand and terminate Adams' employment.  In response, Adams asserts that he has adduced sufficient evidence to create a genuine issue of material fact as to the pretextual nature of the TDFA's proffered reasons.  Fourth, the TDFA asserts that Adams' inability to present more than his own subjective and conclusory allegations that he was the victim of a hostile work environment is fatal to this claim.  Fifth, Adams claims that the district court erred in finding that he was afforded the required due process when he was terminated from his employment.

#### B. Title VII Statute of Limitations

In order for a federal court to exercise subject matter jurisdiction over a Title VII claim, the complaining employee must first (1) timely file a charge with the EEOC setting forth the facts and nature of the allegations of discrimination; and (2) receive notice of the right to sue. *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 545 (6th Cir. 1991).  A complainant who wishes to challenge the

dismissal of an EEOC charge for race discrimination has ninety-five days (including a five-day period for presumptive receipt of notice) from the date of the dismissal in which to file a complaint in district court. 42 U.S.C. § 2000e-5(f)(1). *Accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 557 (6th Cir. 2000) ("If the undisputed facts and/or the record evidence viewed most favorably for the plaintiff, demonstrates as a matter of law that the plaintiff commenced her lawsuit beyond the ambit of limitations, in the absence of a waiver, estoppel, or compelling justification or excuse which tolls limitations . . . a summary dismissal of the complaint should be sustained.").

Adams asserts that the district court erred in finding that his claims of discrimination arising from his June 2002 EEOC charge are time-barred. On June 28, 2002, the EEOC issued a "Dismissal and Notice of Rights" letter informing Adams that his June 2002 EEOC charge was dismissed, and advising Adams of his right to sue. On November 14, 2002, the EEOC issued a second dismissal letter, informing Adams that his November 2002 EEOC charge was dismissed. Adams filed suit on February 10, 2003. Consequently, Adams failed to file suit within the limitations period following the dismissal of the first EEOC complaint, and any claims of discrimination advanced in Adams' June 2002 EEOC charge were time-barred. *Graham-Humphreys,* 209 F.3d at 557. Adams subsequent filing with the EEOC in November 2002 did not revive the claims of racial discrimination addressed in the first EEOC complaint. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393-95 (1982); *Ruiz v. Shelby County Sheriff's Dep't,* 725 F.2d 388, 391 (6th Cir. 1984); *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 222 (8th Cir. 1994) (In a Title VII action based on her second EEOC charge, an African-American employee was barred from raising

claims of racial discrimination based upon the events which prompted her first EEOC charge filed three years earlier, because the employee failed to file suit within 90 days of receiving notice of her right to sue on the first charge.).  Hence, the district court did not err in finding that Adams' claims from the first EEOC complaint were time-barred.

### C.  Adams Title VII Claim of Discriminatory Employment Practices

Adams claims that he was the victim of discriminatory employment practices actionable under Title VII, including race discrimination and hostile work environment.   Title VII prohibits employers from discharging, or otherwise discriminating against, an individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, or national origin.  *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002); *Phillips v. Cohen,* 400 F.3d 388, 397 (6th Cir. 2005).  In order to establish a Title VII claim of employment discrimination, a complainant must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment.  *Johnson v. Kroger Co.,* 319 F.3d 858, 864-66 (6th Cir. 2003).  Here, Adams offers no direct evidence of discrimination and so must rely on circumstantial evidence to establish his *prima facie* case.

To establish a *prima facie* case of racial discrimination under the burden shifting framework outlined in *McDonnell Douglas Corp. v. Green*, the complainant must show that 1) he is a member of a protected class; 2) he is qualified for his job; 3) he suffered an adverse employment action; and 4) for the same or similar conduct, he was treated differently than a similarly situated person outside of the protected class.  411 U.S. 792, 802 (1973).  *See also Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir. 2000).  If the complainant satisfies all four prongs, the burden shifts to the employer to

produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). The employer is not required to persuade the court that it was actually motivated by the proffered reasons; it is sufficient if the "defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981). Courts are not intended to act as "super personnel departments to second guess an employer's facially legitimate business decisions." *Bush v. Am. Honda Motor Co.,* 227 F. Supp. 2d 780, 797 (S.D. Ohio 2002) *quoting Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1007 (7th Cir. 2002).

The pivotal issue in a Title VII claim of discriminatory employment practices is whether "the employer treated some people less favorably than others because of their race" not whether the employer treated an employee less favorably than "someone's general standard of equitable treatment." *Batts v. NLT Corp.,* 844 F.2d 331, 337 (6th Cir. 1988) (citations omitted). Absent sufficient evidence of racial animus, a court may not label an employer's acts as discriminatory, even if the court might have acted differently had it been the employer. *See Ang,* 932 F.2d at 549 (The aim of a court in assessing an alleged Title VII violation "is not to review bad business decisions, or question the soundness of an employer's judgment.").

To show that an employer's proposed legitimate, nondiscriminatory basis for its employment decision was pretextual, "[a] plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Warfield v. Lebanon Corr. Inst.,* 181 F.3d 723, 730 (6th Cir. 1999) (quoting *Manzer v. Diamond Shamrock Chemicals Co.,* 29

F.3d 1978, 1083 (6th Cir. 1994).  The complainant can refute the reason articulated by the employer underlying an adverse employment action by showing that the proffered reason "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct."  *Kroger,* 319 F.3d at 866 (citations omitted).  The complainant has the burden of producing evidence from which a jury could reject a defendant's explanation for the challenged action, and find instead  that the defendant discriminated against the complainant. *Id.*

### 1) Adams' Prima Facie *Case for Race Discrimination*

The district court ruled that even if Adams was not barred from litigating claims arising out of his July 2002 EEOC charge, he still failed as a matter of law to present any triable issue of race discrimination.[1]  For purposes of the summary judgment analysis, the TDFA conceded  that Adams met the first three prongs of the *McDonell* inquiry.  However, the TDFA argues that Adams has offered no proof that any similarly situated person outside of Adams' protected class was treated more favorably.  Adams argues that he has satisfied the fourth *McDonnell* prong, and claims that Bridges is the "similarly situated" individual.

To satisfy the fourth prong of *McDonnell*, Adams must show that Bridges is "similarly situated in all respects."  *Mitchell v. Toledo Hosp.,*  964 F.2d 577, 583 (6th Cir. 1992).  The similarly situated individual must have the same supervisor, be subject to  the same standards, and have previously engaged in the same conduct, absent differing or mitigating circumstances that would distinguish their conduct, or the employer's treatment of them for the same conduct. *Id.* Adams

---

[1]Even though Adams' November 2002 EEOC charge alleges, *inter alia*, sex discrimination and retaliation, these claims were not advanced on appeal.  Appellant's Br. at 5-7.

asserts that Bridges meets the requirements of a similarly situated individual because she is a Caucasian woman, she worked in the same office, performed the same work, reported to the same supervisor, was subject to the same standards, and was involved in the same dispute that resulted in Adams' termination. Adams' insists that the TDFA's failure to either reprimand Bridges or terminate her from employment establishes his *prima facie* case of discriminatory employment practices under *McDonnell*.

The district court properly found that Adams' argument is without merit. Adams was not reprimanded or terminated from employment because of the dispute over the collection of money. Rather, it was Adams' subsequent course of conduct that led to the TDFA's issuance of a written warning and his eventual termination. Adams offered no evidence showing that Bridges responded to criticism from St. Clair by challenging her acts and authority in a series of "vitriolic, sometimes threatening e-mails" as he did. *Adams v. Tenn. Dep't of Fin. and Admin.,* No. 03-0121 at 13 (M.D. Tenn. April 21, 2004)[2] (hereinafter "slip op"). Further, Adams failed to show that Bridges challenged St. Clair in the same manner that he did, engaged in the same, unrelenting e-mail campaign as Adams, or behaved in a similar, obstinate manner. Bridges cannot be considered "similarly situated" to Adams if she did not engage in the same type of conduct as Adams. *See Mitchell,* 964 F.2d at 583 (The plaintiff must show that the "similarly situated" individual's conduct is of the same seriousness as that demonstrated by the plaintiff.). The record is devoid of *any* evidence that Bridges engaged in conduct similar to Adams. Because Adams has failed to identify

---

[2]The district court for the Middle District of Tennessee adopted the Magistrate Judge's Report and Recommendation of April 21, 2004, on May 20, 2004.

an individual who is similarly situated, Adams has failed to establish a *prima facie* case of race

discrimination and unfair employment practices in violation of Title VII.

    *2) TDFA's Nondiscriminatory Reasons for Terminating Adams*

    The TDFA asserts, and the district court agreed,  that even if Adams established a *prima*

*facie* case of race discrimination, the TDFA had legitimate, nondiscriminatory reasons for its

decision to discipline Adams and  terminate his employment.  Adams' inability to work with his co-

workers and his blatant insubordination were legitimate reasons compelling the TDFA's disciplinary

actions.  *See Manzer,* 29 F.3d at 1085 (An employee's combative and obnoxious attitude is a

legitimate, nondiscriminatory reason for an employer to terminate employment.).  *See also Gregory*

*v. Chrysler Corp.,* No. 97- 4442, 1999 U.S. App. LEXIS 8025 at  \*12 (6th Cir. April 28, 1999) (A

plaintiff's inability to work well with others was found to be a legitimate, nondiscriminatory reason

for the defendant to take adverse employment action against the plaintiff); *Campbell v. Hamilton*

*County,* 23 Fed. Appx. 318, 326-27 (6th Cir. 2001) (Comments evincing an employee's obstinate

nature and their refusal to subject themself to supervisory oversight are legitimate grounds for an

adverse employment action.).

    Adams has adduced no evidence showing that the TDFA's explanation of its disciplinary

actions are a pretext for discrimination.  Instead, Adams baldly asserts that the TDFA's proffered

reasons for his termination were not the motivating factors behind his written warning and

termination. Adams relies on his own depositions, affidavits, and e-mails to establish his perceived

basis of the mistreatment.  Adams has failed to produce sufficient evidence from which a jury could

reasonably reject TDFA's explanation for Adams' adverse employment action, as is required for a

showing of pretext in an employment discrimination action. *Manzer*, 29 F.3d at 1083 ("Accordingly, once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."). The TDFA has articulated reasons for terminating Adams' employment that have been historically recognized as legitimate and nondiscriminatory, and Adams has offered no evidence of pretext to rebut these legitimate reasons.

### D. Title VII Claim of a Racially Motivated Hostile Work Environment

Under Title VII, a hostile work environment occurs when an individual's workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's working environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993). In order to prevail on a Title VII hostile work environment claim, a complainant must prove that the defendant's conduct was objectively severe or pervasive enough to create a work environment that any reasonable person would find hostile or abusive, and the victim must subjectively regard the environment as abusive. *Id.* at 21-22. "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Of paramount importance, the court must "distinguish between harassment and discriminatory harassment," because it is the latter that is requisite to a Title VII hostile work environment cause of action. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir. 2000).

In support of his hostile work environment claim, Adams alleges that any reasonable person who was suddenly 1) forced to use sick or annual leave for matters which never previously required the use of leave time, 2) formally chastised over a non-work related misunderstanding, 3) repeatedly "singled out" and humiliated during staff meetings, 4) subjected to "unprecedented" monitoring by co-workers, 5) yelled at openly, 6) negatively evaluated for the first time concerning matters never before brought to his attention, 7) prohibited from making minor modifications to one's schedule, inconsistent with past practices, 8) indirectly subjected to racial slurs, 9) having one's complaints of disparate treatment disregarded and dismissed, and 10) dismissed from employment after seeking help from outside superiors, would find their work environment hostile.

There is no question that Adams subjectively found his environment hostile. However, Adams fails to present the objective evidence to substantiate his hostile work environment claim. Instead, he relies on his own subjective and conclusory allegations of discrimination. While he alludes to situations which could arguably be hostile including public chastisement, sudden oversight by co-workers, interference with scheduling etcetera, he has failed to show that *any* of these actions are the result of racial animus. In fact, Adams testified in his deposition that he could not identify any co-worker, in or outside of the protected class, who was being treated any differently in his work environment. Even after complaining about St. Clair's treatment toward him, he admitted that she treated his African American colleagues professionally. None of the incidents identified by Adams singularly or collectively, rise to the level of racial harassment. *See Harris,* 510 U.S. at 21. ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive -

is beyond Title VII's purview."). Adams has failed to establish a *prima facie* case of a hostile work

environment under Title VII.

### E. Adams' Due Process Claim

Adams' final claim on appeal is that his due process rights were abridged by the manner in

which he was terminated from his employment.

According to the Tennessee Department of Personnel Rules:

(1) Career employees have a "property right" to a position in the classification in which they currently hold career status. Therefore, no suspension, demotion, dismissal or any other action which deprives a regular (career) employee of his "property right" will become effective until minimum due process is provided as outlined below.

(2) "Minimum due process" consists of the following:

(a) The employee shall be notified of the charges against him. Such notification shall detail times, places, and other pertinent facts concerning the charges and should be in writing.

(b) The notification will provide for the employee to have a predecision discussion with an appropriate manager and will state the mechanism through which such a discussion may be arranged. The employee should be given a reasonable period of time to prepare to answer charges and present information which might influence the manager's decision.

(c) The manager conducting such discussions must be an appointing authority or manager who has direct access to the appointing authority for this purpose.

(d) The meeting outlined above shall be for the purpose of allowing the employee to present information to the manager regarding the disciplinary action under consideration.

(e) The discussion shall be informal. The employees shall have the right to present written statements of witnesses or any other information with regard to the charges. Attendance and participation by persons other than the manager and the employee shall be at the discretion of the manager.

(f) If the employee declines the opportunity to have the discussion or present information the provisions of this section are deemed to have been met.

TENN. COMP. R. & REGS., R. 1120-10-.03 (2003). Adams claims that his due process rights were violated because his termination became "effective" within the meaning of the rules when he was escorted off of state property on October 21, 2002, not when he was issued the November 18, 2002, termination letter. Adams alleges that he should have been afforded an opportunity to meet with an appropriate manager and present his information prior to being escorted off of the work site.

We find that Adams was afforded all the process he was due under the Tennessee Department of Personnel Rules. Adams was notified of his pending termination in the October 21, 2002, letter from Deputy Commissioner Kellogg. The letter detailed the basis for Kellogg's recommendation and provided Adams notice of his rights. Adams availed himself of the right to an informal hearing, and met with Deputy Commisioner Hawkins on October 25, 2002. At the meeting, Adams provided copies of his e-mail messages along with additional materials for Hawkins' consideration. On November 18, 2002, Adams received official notice of his termination.

After reviewing the due process requirement of the Tennessee Department of Personnel, and the procedure used for Adams' termination, we find that there was no due process violation. Accordingly, Adams' due process claim is without merit.

## IV. CONCLUSION

For the aforementioned reasons, the ruling of the district court is **AFFIRMED**.